# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| 26 CROWN ASSOCIATES, LLC, *et al.*<br>    *Plaintiffs*,<br><br>v.<br><br>GREATER NEW HAVEN REGIONAL<br>WATER POLLUTION CONTROL<br>AUTHORITY, *et al.*<br>    *Defendants*. | No. 3:15-cv-1439 (JAM) |

### RULING GRANTING MOTIONS TO DISMISS

    Like scores of older cities in the United States, the City of New Haven in Connecticut faces significant challenges from an aging and obsolete sewer system. New Haven has what is known as a "combined sewer system"—a system for which the majority of the pipes that carry the City's sewage end up combining underground with pipes that carry waters collected from storm drains during wet weather events. This type of combined system is designed to economize on the use of underground piping and to channel all sewage and storm drainage waters to a central water treatment plant to be "treated" or sanitized prior to discharge of the waters to a natural body of water such as a river, lake, or sea.

    But a heavy rainfall can mean great trouble for a combined sewer system: a tsunami of sewage and storm water may very suddenly flood the system, far more than the treatment plant can possibly handle at one time. This may result not only in the backflow of sewage to homes and businesses served by the sewage lines but also in the release of wholly untreated sewage to the river, lake, or sea. *See City of Milwaukee v. Illinois and Michigan*, 451 U.S. 304, 308–09 (1981); U.S. Environmental Protection Agency, Region 1: EPA New England, What are

1

Combined Sewer Overflows?, *available at* https://www3.epa.gov/region1/eco/uep/cso.html (last accessed July 10, 2017).

Plaintiffs in this case are three companies who own, lease, and manage an apartment building at 26 Crown Street in downtown New Haven. They have filed this lawsuit against defendants City of New Haven and the Greater New Haven Regional Water Pollution Control Authority. By means of a broad-ranging complaint that amounts to an indictment of New Haven's combined sewer system, they seek to hold defendants responsible for the system's failures that have led to continuing and chronic backflows of sewage into the basement of 26 Crown Street, as well as to backflows of sewage onto the property of thousands of other New Haven property owners, and to releases of untreated sewage directly into the Long Island Sound. Plaintiffs allege in principal part that defendants have acted in violation of the federal Clean Water Act.

Defendants have now moved to dismiss this action on several grounds. For the reasons set forth below, I will grant their motions. As an initial matter, I conclude that the only injury for which plaintiffs have standing is the backflow of sewage onto their own property. Plaintiffs as corporate entities do not have standing to assert any injuries from the loss of aesthetic enjoyment of a clean environment. Nor do they have standing to assert the rights of other New Haven property owners or to complain more generally about discharges of sewage into the Long Island Sound that have no effect on them or their business.

As to the sole type of injury for which plaintiffs have standing (the backflows of sewage onto their own property), I conclude for two reasons that plaintiffs do not allege a valid claim under the Clean Water Act. First, a violation of the Clean Water Act requires that there have been a discharge of pollutants to navigable waters, and the bare facts alleged by plaintiffs do not

give rise to a plausible inference that any backflows of sewage onto their property have reached the Long Island Sound more than half a mile away. Second, even fully crediting plaintiffs' allegations that the sewage backflows in their basement have seeped through the floor and into the ground water beneath their property and that there is some sort of a hydrologic connection between this ground water and the Long Island Sound, I conclude that such allegations of the pollution of navigable waters by means of passive ground water migration do not suffice as a matter of law to state a claim under the Clean Water Act.

Therefore, I will dismiss plaintiffs' principal claim under the Clean Water Act. I will likewise dismiss plaintiffs' claim under the Constitution's Takings Clause, because plaintiffs have not sought compensation through state law procedures, and thus their claim is not yet ripe for review. All of plaintiffs' remaining claims arise under state law, and I will decline to exercise jurisdiction over these remaining claims in the absence of any federal law claims. Accordingly, I will dismiss this action without prejudice to plaintiffs' right to pursue their state law claims in the state courts of Connecticut.

## BACKGROUND

The plaintiffs in this case are three companies—26 Crown Street Associates, LLC, 26 Crown Master Tenant, LLC, and PMC Property Group, Inc.—that all have something to do with the ownership, leasing, or management of an apartment building at 26 Crown Street in downtown New Haven. Their building has 64 residential units as well as a coffee shop on the ground floor.

The building at 26 Crown Street lies over half a mile from the Long Island Sound.[1] It is a few blocks from the federal courthouse where this case has been heard, and I take judicial notice that 26 Crown Street is separated from the Long Island Sound by several city blocks, the Northeast Corridor railroad tracks, a massive IKEA store and parking lot, and multiple lanes of the I-95 interstate highway that run adjacent to New Haven Harbor.

Plaintiffs have sued both the City of New Haven (the "City") and the Greater New Haven Water Pollution Control Authority (the "Authority"), alleging that they are responsible in one way or another for chronic failures of the combined sewer system in New Haven. According to the complaint, the City has transferred primary management and legal responsibility for the operation and management of the piping and pumping stations of the combined sewer system to the Authority. The City has otherwise retained ownership and control of the storm water catch basins and storm water pipes that lead to the combined sewer system. The precise roles of the defendants are not important at this time to the resolution of the motions to dismiss.

The complaint alleges environmental harm from the inability of the combined sewer system to manage large quantities of water that occur during wet weather events. These events allegedly "result[] in back-ups in the pipes followed by discharges of untreated wastewater, sewage and storm water . . . at various points within New Haven." Doc. #64 at 6 (¶ 18). The complaint goes on to allege the following details about these releases of untreated wastewater:

> While some combined sewer flows exit the systems through planned outfall pipes and from there into tributaries and into the Long Island Sound, these releases are nonetheless of untreated sewage and storm water. The majority of the combined sewer overflows release into the West River, the Mill River, and the Quinnipiac River. Eleven of them release sewage directly into the Long Island [S]ound. Other releases occur in unplanned releases through virtually any leak or aperture in the pipes. *This includes drain pipes in the basements of buildings such as the ones* [sic]

---

[1] In their second amended complaint, plaintiffs allege that the property is located one-tenth of a mile from the Long Island Sound; in their supplemental briefing, however, plaintiffs revise the estimate to "just over a half mile (about 3,500 feet) from the Long Island Sound." *See* Docs. #64 at 2, #61 at 7.

> *the plaintiffs own.* It also includes back up [into] the catchment basins from the storm water systems and manhole access points to the sewer. On information there are numerous releases of untreated sewage into the Long Island Sound and its tributaries each year as the result of combined sewage overflows.

*Id.* at 6–7 (¶ 18) (emphasis added).

The complaint further alleges that "[t]he Crown Street Property has experienced backflows on the property, including the flooding of untreated sewage in, among other areas, the residential units and common areas of the Crown Street Property." *Id.* at 9 (¶ 21). In addition, this backflow "phenomenon affects a numbers of other residents and property owners in New Haven, the total of which may be in the thousands." *Id.* at 9 (¶ 22). The backflows leave "areas within and outside affected properties, including but not limited to the living spaces, basements, yards and paved areas of the affected buildings, with standing water which is essentially untreated sewage consisting of human excrement and pollutants." *Id*. at 10 (¶ 28).

According to the complaint, some of the backflow waters end up seeping into the ground and into the underground water table: "Because the basements affected by the backflow were constructed decades ago or more, the basements have cracks through which the sewage waters can escape and enter the soil below the basement, eventually working their way to the water table beneath the properties." *Id.* at 10–11 (¶ 28). In similar fashion, the complaint elsewhere alleges that antiquated pipes within the combined sewer system have leaks that allow polluted water to enter the ground and ground waters. *Id.* at 12 (¶ 33). The complaint alleges that ground waters "are subject to regulation under State law," and—more ambiguously—that "[g]round waters this close to the Long Island Sound are hydraulically [sic] connected to the various streams that empty into the Long Island Sound." *Id.* at 11 (¶ 29).

In terms of the harm suffered by plaintiffs, the complaint alleges that plaintiffs have not only suffered "injury directly to their property and its tenants," but also that they "have suffered

5

injuries as citizens from the additional releases of untreated sewage into the Long Island Sound during Combined Sewer Overflows and from releases that have occurred elsewhere in the City due to backflow." *Id.* at 11 (¶ 30). "These injuries are ecological and aesthetic in the sense that the sewage is odorous and despoils that natural state of the creeks and land surrounding the tributaries and the Long Island Sound itself." *Ibid.*

The City and the Authority are allegedly aware of the pollution problems described above but have not taken the necessary steps to correct the problem. *Id*. at 12–13 (¶ 34). Accordingly, plaintiffs have brought this suit and seek certification to represent a class of property owners and others in New Haven who are adversely affected by the pollution that results from the failures of the combined sewer system. *Id.* at 13–15 (¶¶ 35–44).

The second amended complaint, which is now the operative complaint in this action, asserts the following claims. Count One alleges that the release of untreated sewage during combined sewer overflow events, both into the Long Island Sound and onto private properties, constitutes a violation of the Clean Water Act, 33 U.S.C. § 1311(a). Count Two alleges a "takings" claim under the federal and state constitutions. Counts Three through Ten allege state law claims including but not limited to private nuisance, trespass, negligence, negligence per se, and public nuisance.

Plaintiffs seek an award of money damages, fines, and attorney's fees, as well as specific injunctive relief. They ask for a temporary injunction against the City to prevent it from further expanding the user base for the sewer system until such time as the City can protect users from backflows of polluted waters. They also seek a permanent injunction to require the City and the Authority to undertake infrastructural improvements to prevent future backflows from the combined sewer system.

## DISCUSSION

Defendants have moved to dismiss the complaint on a variety of grounds under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. It is well established that federal courts should resolve any doubts about the existence of federal subject matter jurisdiction prior to considering the merits of a complaint. *See, e.g.*, *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

For purposes of a Rule 12(b)(6) motion to dismiss, the Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless its factual recitations state a claim to relief that is plausible on its face. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014). The Supreme Court has elaborated as follows on the "plausibility" standard for evaluating a motion to dismiss:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. . . . The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Iqbal*, 556 U.S. at 678 (citations and internal quotation marks omitted). Naturally enough, because the focus of "plausibility" review is on what *facts* a complaint alleges, a court is "not bound to accept as true a legal conclusion couched as a factual conclusion" nor "to accept as true allegations that are wholly conclusory." *Krys v. Pigott*, 749 F.3d 117, 128 (2d Cir. 2014).

The same plausibility principles that govern a motion to dismiss pursuant to Rule 12(b)(6) apply with equal force to the evaluation of the Court's subject matter jurisdiction pursuant to Rule 12(b)(1). *See Lapaglia v. Transamerica Cas. Ins. Co.*, 155 F. Supp. 3d 153, 155–56 (D. Conn. 2016) (extended discussion).

*Standing*

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. The reason for a case-or-controversy limitation is to restrain the federal courts from enmeshing themselves in deciding abstract and advisory questions of law, no matter how interesting these questions might be as a matter of public policy or academic amusement. Accordingly, any federal court plaintiff must have case-or-controversy "standing" to assert a claim—specifically, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *E.M. v. New York City Dep't of Educ.*, 758 F.3d 442, 449–50 (2d Cir. 2014).

The first requirement—that a plaintiff have sustained an injury-in-fact—ensures that the plaintiff has a personal stake in the outcome of the controversy. *See Susan B. Anthony List*, 134 S. Ct. at 2341. An injury-in-fact must not only be concrete and particularized but also actual or imminent, rather than conjectural or hypothetical. *See ibid.*; *E.M.*, 758 F.3d at 449. Even in class action lawsuits, the named class plaintiffs must show that they themselves have sustained an injury common to the class, and the fact that other class members have been injured does not allow a class action to proceed in the absence of injury to the named class plaintiffs. *See Warth v. Seldin*, 422 U.S. 490, 502 (1975); *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 199 (2d Cir. 2005).

I don't doubt for a moment that plaintiffs have standing to the extent that the complaint alleges backflows on their property at 26 Crown Street. The more troublesome issue is whether plaintiffs have standing as to any of the other types of injuries they describe in their complaint.

8

For example, plaintiffs complain that the backflow problems that have plagued their own property also "affect[] a number of other residents and property owners in New Haven, the total of which may be in the thousands." Doc. #64 at 9 (¶ 22). But it is a "rooted principle of standing" that "a party must 'assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 58 (2d Cir. 2013) (quoting *Warth v. Seldin*, 422 U.S. at 499). Plaintiffs have no standing to assert causes of action stemming from backflows on properties elsewhere in New Haven.

Plaintiffs likewise claim "ecological and aesthetic" injury. But plaintiffs are companies, not natural persons. A company cannot suffer hurt feelings or a violation of some perceptual or emotional sense of well-being. Companies do not suffer aesthetic injuries from harm to the environment. *See, e.g.*, *Citizens Coordinating Comm. on Friendship Heights, Inc. v. Washington Metro. Area Transit Auth.*, 765 F.2d 1169, 1173 (D.C. Cir. 1985); *Kara Holding Corp. v. Getty Petroleum Mktg., Inc.*, 2004 WL 1811427, at *13 (S.D.N.Y. 2004).

Plaintiffs also claim economic injury as a result of the overflows of sewage to the Long Island Sound. But plaintiffs have not alleged facts that plausibly establish economic injury that is actual or imminent. They don't have a beach or a sailing club. They do not allege that the Long Island Sound has anything to do with their corporate business model or that they have suffered any actual economic loss stemming from occasional sewer discharges to the Long Island Sound that lies more than half a mile away from plaintiffs' property. The Supreme Court has made clear that "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Env. Servs., Inc.*, 528 U.S. 167, 181 (2000). Plaintiffs have not alleged facts that plausibly establish any injury to them from the alleged pollution of the Long Island Sound.

9

The best that plaintiffs can do is to argue that it is "certainly foreseeable that residents will leave or not choose to move to the Plaintiffs' properties in favor of properties elsewhere in the City of New Haven" because of pollution to the Sound. Doc. #61 at 7. But the Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that [a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (emphasis in original; internal quotation marks omitted). Plaintiffs lack standing to assert any causes of action stemming from the pollution of the Long Island Sound.

*Clean Water Act*

In light of my conclusion that plaintiffs have standing only insofar as they seek relief for backflows to their own property at 26 Crown Street, I now turn to whether this specific injury suffices to allow for a cause of action under the federal Clean Water Act as plaintiffs allege. I conclude that the answer is no.

Enacted by Congress in 1972, the Clean Water Act's purpose is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The Act prohibits "the discharge of any pollutant by any person," unless done in compliance with a provision of the statute. 33 U.S.C. § 1311(a). The term "discharge of a pollutant" is a statutory term of art – it is defined by the Act specifically to mean "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). As relevant here, a discharge of a pollutant is lawful if it is done in accordance with a permit that has been issued pursuant to the National Pollution Discharge Elimination System (NPDES) requirements of the Clean Water Act. *See generally Catskill Mountains Chapter of Trout Unlimited, Inc. v. Envtl. Prot. Agency*, 846 F.3d 492, 501–02 (2d Cir. 2017) (summarizing history and basic legal framework of the Clean Water Act).

From all this it is clear that the Clean Water Act does not purport to regulate (or to require a permit for) every act that involves the noxious pollution of clean water. Instead, consistent with long-established principles of federalism, the Clean Water Act's permitting requirements are limited to regulating the discharge of pollutants into the navigable waters of the United States. *See ibid.*; *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 216 (2d Cir. 2009).

Because of this requirement that there be a discharge into navigable waters, the fact that sewage backflows may have flooded plaintiffs' basement does not amount to a violation of the Clean Water Act. As the D.C. Circuit has noted, "the Clean Water Act … was enacted not to create a federal tort of subterranean trespass but to protect navigable rivers and streams from pollution, and to require those who desire to discharge pollutants into the waterways to obtain a permit for doing so." *Citizens Coordinating Comm.*, 765 F.2d at 1173 (no Clean Water Act violation stemming from fuel seepages into plaintiff's basement).

As to the navigable waters requirement, the complaint does not plausibly allege that any of the sewage backflows onto the property of 26 Crown Street involved a discharge of pollutants to navigable waters of the United States. By plaintiffs' admission, the nearest navigable waters (the Long Island Sound) are more than half a mile away. It would be nothing but fanciful and well exceeding the bounds of plausibility to conclude that the occasional backflows of polluted water into the basement of plaintiffs' property somehow find their way past several city blocks, the Northeast Corridor train tracks, sprawling acres of an IKEA parking lot, and six or more lanes of Interstate 95 to contaminate the Long Island Sound.

In *Rapanos v. United States*, 547 U.S. 715 (2006), the Supreme Court considered the outer bounds of what acts may be subject to regulation under the Clean Water Act. Specifically, the Supreme Court there considered whether the Clean Water Act regulates the discharge of

11

pollutants into wetlands that are adjacent to non-navigable tributaries of traditionally navigable waters. While no one disputed that the "the meaning of 'navigable waters' in the [Clean Water Act] is broader than the traditional understanding of that term," 547 U.S. at 731, the justices sharply divided over the proper test to apply to determine whether a discharge of pollutants to land that is near to traditionally navigable waters may be subject to regulation under the Clean Water Act.

On the one hand, a plurality of four of the justices concluded that a wetland adjacent to a non-navigable tributary comes within the definition of "navigable waters" only if there is "a continuous surface connection" between the wetland and traditionally navigable waters (such as an ocean, lake, river, or stream). *Id.* at 739, 742 (plurality opinion of Scalia, J.). By contrast, "[w]etlands with only an intermittent, physically remote hydrologic connection" to such waters would not be subject to federal regulation under the Clean Water Act. *Id.* at 742.

Concurring only in the judgment reached by the plurality, Justice Kennedy concluded that a wetland is subject to federal regulation under the Clean Water Act only if it possesses a "significant nexus" to navigable-in-fact waters, meaning that the wetland in question "significantly affect[s] the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 780. According to Justice Kennedy, there was no requirement for a continuous surface connection, but a "mere hydrologic connection" between a wetland and traditionally navigable waters would not alone suffice to satisfy the "significant nexus" test. *Id.* at 784–85.

After *Rapanos* the courts of appeals have tied themselves in knots trying to determine if the controlling rule is that set forth by the Justice Scalia plurality or that set forth by the lone concurring opinion of Justice Kennedy. *See, e.g.*, *United States v. Donovan*, 661 F.3d 174, 180–

84 (3d Cir. 2011) (describing circuit split and concluding that "federal jurisdiction to regulate wetlands under the [Clean Water Act] exists if the wetlands meet either the plurality's test or Justice Kennedy's test from *Rapanos*"). The Second Circuit has yet to address the issue, and I won't either, because no matter which test is applied from *Rapanos*, the Clean Water Act does not regulate any of the discharges of polluted waters to plaintiffs' property at 26 Crown Street.

If I assume that the four-justice plurality's test governs, I conclude that plaintiffs have done nothing to allege or show a continuous aqueous surface connection between their apartment building and the Long Island Sound. If instead I assume that Justice Kennedy's test governs, then I conclude that plaintiffs have done nothing to allege or show a significant hydrologic nexus between 26 Crown Street and the Long Island Sound.

To be sure, the complaint alleges that backflows into the basement of 26 Crown Street seep into the ground and eventually to the ground waters below, and further that these ground waters in turn are "hydraulically [sic] connected to the various streams that empty into the Long Island Sound." Doc. #64 at 11 (¶ 29). But these strained allegations of the necessary hydrological connection fall well short of what *Rapanos* requires. They don't show a *surface* connection as the plurality would require. Nor do they show a *significant* nexus as Justice Kennedy would require. Indeed, it is wholly speculative and implausible to conclude that the occasional flooding of the basement of 26 Crown Street has any effect at all—much less a significant effect—on the waters of the Long Island Sound more than half a mile away.

Even if I assumed that plaintiffs had alleged facts that make it plausible to conclude that the backflows at 26 Crown Street have had a significant effect through ground water migration on the Long Island Sound, I think these facts would still fall short of alleging a violation of the Clean Water Act. That is so for two reasons. First, ground water itself is not navigable, and so

13

the act of polluting ground water does not of itself violate the Clean Water Act.[2] Second, if polluting the ground water does not violate the Clean Water Act, then a pollution-of-navigable-waters-by-ground-water-contamination theory necessarily relies on an assumption that ground water must function as a "point source" conduit for the pollution of navigable waters. This is so because a violation of the Clean Water Act requires that the pollution of navigable waters result from a "point source"—that is, a discrete conveyance channel that is used to directly pollute navigable waters.[3]

It is basic science that ground water is widely diffused by saturation within the crevices of underground rocks and soil.[4] Absent exceptional proof of something akin to a mythical Styx-like subterranean river, a diffuse medium like ground water for the passive migration of pollutants to navigable waters cannot constitute a "point source" within the meaning of the Clean Water Act.

Although the Second Circuit has not addressed this issue, it has made clear that there is no "point source" of pollution when navigable waters are polluted by means of ordinary surface water run-off. *See Cordiano*, 575 F.3d at 214–18; *see also United States v. Plaza Health Labs., Inc.*, 3 F.3d 643, 646 (2d Cir. 1993) (explaining that "point sources" are "physical structures and

---

[2] By way of a footnote in *Cordiano*, the Second Circuit stated that it "need not address whether the CWA [Clean Water Act] applies to ground water contamination, though there is authority that it does not." 575 F.3d at 223 n.6 (citing *Rice v. Harken Exploration Co.*, 250 F.3d 264, 269 (5th Cir. 2001), and *Village of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 965 (7th Cir.1994)).

[3] *See Catskill*, 846 F.3d at 502 (quoting chain of statutory provisions). A "point source" is defined in relevant part as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

[4] *See, e.g.*, U.S. Geological Survey, The Water Science School, Groundwater Discharge – The Water Cycle, *available at* https://water.usgs.gov/edu/watercyclegwdischarge.html (last accessed on July 10, 2017) ("Have you ever heard that there are rivers of water flowing underground? Do you think it is true? Actually, it is pretty much a myth. Even though there are some caverns, lava and ice tubes, and horizontal springs that can carry water, the vast majority of undergroundwater occupies the spaces between rocks and subsurface material. Generally, water underground is more like water in a sponge. It occupies the spaces between soil and rock particles. At a certain depth below the land surface, the spaces between the soil and rock particles can be totally filled with water, resulting in an aquifer from which groundwater can be pumped and used by people.").

instrumentalities that systematically act as a means of conveying pollutants from an industrial source to navigable waterways"). This is true even though non-point-source pollution is a major contributor to the pollution of the nation's navigable waterways. *See, e.g.*, *Oregon Nat'l Res. Council v. United States Forest Serv.*, 834 F.2d 842, 849 (9th Cir. 1987).

Ground water migration is no different than surface water run-off for purposes of the "point source" requirement. Neither of these means for the movement of pollutants to navigable waters is a discrete and channelized conveyance of the kind that is required for the Clean Water Act's NPDES permitting requirements to apply.

At least some other courts agree. "The migration of pollutants through soil and groundwater is nonpoint source pollution that is not within the purview of the CWA [Clean Water Act]." *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, -- F. Supp. 3d --, 2017 WL 2266875, at *4 (D.S.C. 2017). Put differently, "Congress did not intend for the CWA [Clean Water Act] to extend federal regulatory authority over groundwater, regardless of whether that groundwater is eventually or somehow 'hydrologically connected' to navigable surface waters." *Cape Fear River Watch, Inc. v. Duke Energy Progress, Inc*., 25 F. Supp. 3d 798, 810 (E.D.N.C.), *as amended,* 2014 WL 10991530 (E.D.N.C. 2014); *but see Sierra Club v. Virginia Elec. and Power Co.*, 145 F. Supp. 3d 601, 607–08 (E.D. Va. 2015) (collecting cases on both sides of issue involving ground water pollution and concluding that allegation of ground water contamination was sufficient to violate the Clean Water Act in context of ground pollution by power plant adjacent to a river).

In *Peconomic Baykeeper, Inc. v. Suffolk County*, 600 F.3d 180 (2d Cir. 2010), the Second Circuit concluded that the "point source" requirement was met by evidence of spraying of pesticides into navigable waters from trucks and helicopters, and the court of appeals rejected the

reasoning "that because the trucks and helicopters discharged pesticides into the air, any discharge was indirect, and thus not from a point source." *Id.* at 189. I think *Peconomic Baykeeper* is distinguishable from this case because there is a difference between a migration medium that is the air and a migration medium that is the land or subterranean ground waters. If this were not so, then any non-point-source pollution (such as ordinary surface run-off from the land into navigable waters) could invariably be reformulated as point-source pollution by going up the causal chain to identify the initial point sources of the pollutants that eventually ended up through non-point sources to come to rest in navigable waters.

Indeed, if the Clean Water Act were to apply as a routine matter to the discharge of pollution onto the ground that ends up seeping into the ground water, then Congress's purpose to limit the scope of the Clean Water Act would be easily thwarted. It would become commonplace for litigants to style any claim of ground pollution as a claim for Clean Water Act pollution on the basis of speculation and attenuated causal inferences that ground pollution (and any ensuing pollution of ground waters) may ultimately end up polluting navigable waters. These claims would effectively read the "point source" requirement out of the Clean Water Act. *See Cordiano*, 575 F.3d at 219 (noting that the term "point source" should be "broadly interpreted" but that it "cannot be interpreted so broadly as to read the point source requirement out of the statute"). I decline to do so.

In sum, as to plaintiffs' Clean Water Act claim, I conclude that plaintiffs have standing only for the pollution of their own property at 26 Crown Street. I further conclude, however, that this pollution of 26 Crown Street is not subject to regulation under the Clean Water Act. Accordingly, plaintiffs' claim under the Clean Water Act as stated in Count One of the second

16

amended complaint will be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

### *Takings Claim*

The only remaining federal cause of action is plaintiffs' "takings" claim as alleged in Count Two of the second amended complaint. "The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, prohibits the government from taking private property for public use without just compensation." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001). Here, however, plaintiffs concede that they have not sought "just compensation" through available state procedures. Accordingly, plaintiffs' claim is not ripe and must be dismissed. *See Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 109–10 (2d Cir. 2009); *Komondy v. Gioco*, 59 F. Supp. 3d 469, 475–79 (D. Conn. 2014).

### *Remaining State Law Claims*

All of plaintiffs' remaining claims are state law claims. "It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims." *Klein & Co. Futures, Inc. v. Bd. of Trade of N.Y.C.*, 464 F.3d 255, 262 (2d Cir. 2006). Having concluded that plaintiffs' federal claims must be dismissed, I will decline to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. *See* 28 U.S.C. § 1367(c)(3).[5]

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss (Docs. #39, #40, and #42) are GRANTED, without prejudice to plaintiffs' right to seek relief for any state law claims in the state courts of Connecticut. The Clerk of Court shall close this case.

---

[5] Two of the defendant companies in this case are alleged to be Connecticut companies (Doc. #64 at 2 (¶¶ 3&5)), and the complaint does not allege diversity jurisdiction pursuant to 28 U.S.C. § 1332.

It is so ordered.

Dated at New Haven this 11th day of July 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge